United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 30, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-70043

MARTIN ALLEN DRAUGHON,

Petitioner – Appellee-Cross-Appellant,

versus

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellant-Cross-Appellee.

Appeal from the United States District Court
For the Southern District of Texas, Houston

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

Patrick E. Higginbotham, Circuit Judge:

A jury in Harris County, Texas, convicted Martin Allen Draughon of murdering Armando Guerrero during a robbery and sentenced him to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence.[1] The state trial court filed findings of fact and conclusions of law denying habeas relief which were in turn adopted by the Court of Criminal Appeals in an

---

[1] *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992), *cert denied* 509 U.S. 926 (1993).

unpublished order in 2001.[2] Draughon filed his federal petition in 2002, and the federal district court entered the judgment now before us on September 20, 2004.[3]

In its opinion, the district court held that Draughon's counsel provided ineffective assistance at both the guilt and sentencing phases of his trial, and that the state court's contrary decision was an unreasonable application of settled federal law. It ordered the State of Texas to either release him or try him again. Draughon's convictions stemmed from his robbery of a restaurant. As he fled the scene of the crime, he shot and killed a pursuing bystander. He denied any intent to harm, insisting that he had been attempting to fire over the heads of his pursuers. The State offered testimony that the fatal shot that struck Guerrero in the chest was fired at close range, approximately ten steps away. The court found that defense counsel failed Draughon in not obtaining expert forensic examination of the path of the fatal shot; that such an effort could have provided the jury with evidence that the fatal bullet had bounced off the pavement in front of the victim and was fired some distance away.

---

[2] *Draughon v. Dretke*, No. H-02-1679 (S.D. Tex. Sept. 20, 2004) (unpublished order).

[3] *Ex parte Draughon*, No. 27,511-02 (Tex. Crim. App. May 9, 2001) (unpublished).

2

The State filed a timely notice of appeal.  In turn, Draughon seeks a certificate of appealabilty on a *Penry* claim should this court reverse.


I

On November 22, 1986, Draughon attempted to rob a Long John Silver's restaurant in Houston, Texas.  Hubbard Eugene Taylor, the assistant manager, closed the restaurant at approximately 11:00 p.m.  As he finished closing up, Taylor saw two relatives of his cashier gesturing to him through the window.  Taylor and two employees went outside.  A man wearing a stocking mask pointed a gun at them and said, "This is a stick up.  Get back inside."  The four complied.  The robber told Taylor to "[g]et that alarm in the back.  I know it's in the back."  Taylor went to open the safe.  The safe had a delay mechanism that required Taylor to wait ten minutes after entering the combination for a green light to come on, signifying that the safe could be opened.  While Taylor waited, the robber approached him and asked, "[w]here is that green light?"  While still waiting for the green light, Taylor heard some noise coming from the front of the restaurant.  He later learned that the noise was caused by several people banging on the doors and windows.  The robber then went to the back of the restaurant.  Taylor heard the alarm go off and saw the robber leaving through

3

the back door.  Restaurant employee Susan Cuellar later identified Draughon as the robber.

Ricardo Guerrero lived near the restaurant.  As he drove up to his apartment shortly before midnight on November 22, 1986, he saw Eva Cuellar running, crying and screaming for help.  Guerrero followed Ms. Cuellar to the back of the restaurant.  Attracted by her pleas for help, others also followed.  Guerrero saw the back door of the restaurant open and a man run through it.  The man ran into the parking lot and turned around.  Guerrero heard a shot, threw himself to the ground, and heard several more shots.  He also heard a truck.  When Guerrero looked up, he saw the man jumping into the bed of a moving truck.  Guerrero testified at trial that the man fired no additional shots after jumping onto the truck. After the truck left, Guerrero stood up and saw his cousin, Armando Guerrero, lying on the ground with a bullet wound in his chest. Several of the men in the parking lot drove Armando to an emergency room, where he died.

Eva Cuellar, the mother of the restaurant cashier, was the key witness.  She was standing near Armando when he was shot. She testified that she lived across the street from the Long John Silver's where her daughter Susan worked. With the late hour she became apprehensive about her daughter as the restaurant was preparing to close. Accompanied by her young son Eddie and armed with a knife, she walked to the restaurant and peered into the window.  All appeared well at the time and she started back to the

4

family home, leaving Eddie at the restaurant to accompany his sister home at closing. Not satisfied, she returned and this time saw that a man had drawn a stocking over his face and was holding a gun on the workers, including her daughter, Susan, and her son, Eddie. It was then that she fled down the street securing the help of some men who were having a beer in front of their homes. They returned to the restaurant and Armando suggested he and Ms. Cuellar go to the rear of the building and catch the robber if he fled out the back door. As they arrived at the rear Draughon suddenly burst through the door in a run. Ms. Cuellar testified that Draughon took about ten running steps after leaving the restaurant, and began shooting. She saw the "fire" from the pistol and Armando fall, holding his chest. According to her testimony, Draughon fired three to six times before jumping into the back of a waiting truck which was pulling away. The pursuers were not armed except for the knife Ms. Cuellar had earlier procured. Thinking that Draughon had harmed her children, she chased the fleeing Draughon, throwing her knife at him in frustration and without effect.

Norene Smith, a nurse working in the emergency room when Armando was brought in, described the medical staff's unsuccessful efforts to resuscitate him. Smith explained that the bullet struck Guerrero's heart, leaving a great deal of blood in the chest cavity. Dr. Aurelio Espinola, a forensic pathologist, testified that the gunshot wound caused the death.

5

Following his arrest, Draughon was tried for capital murder. The parties agree that the following summary of evidence found by the federal district court is accurate:

> Draughon testified on his own behalf during the punishment phase of trial . . . . Draughon explained the events that led to the shooting. Kenneth Gafford had formerly worked for the Long John Silver's and knew how the restaurant was set up and how the safe and alarm system worked. His information led to the planned robbery. Draughon testified that he saw a crowd forming outside the restaurant during the attempted robbery, became nervous, and ran out the back door toward the pickup truck where Gafford was waiting to drive away. The pickup was parked near the back of the restaurant. As Draughon neared the truck, he turned and saw several people chasing him. Draughon testified that he dove into the back of the truck bed, leaned over the railing, and fired four shots. He testified that he aimed over the heads of the crowd and was only trying to scare people so they would stop chasing him. Draughon did not know that he shot Guerrero. Draughon offered no expert ballistics testimony in his defense. Charles Anderson, Firearms Examiner for the Houston Police Department, testified that nothing on the bullet recovered from Guerrero's body showed that it had hit an object and ricocheted before striking Guerrero.[4]

The district court also summarized the testimony offered by Draughon during the evidentiary hearing in support of his claim that counsel was ineffective for failing to present ballistics evidence during trial:

> Lucian Haag, a certified criminalist, testified at the evidentiary hearing in this court.[5] Haag has particular training and expertise in firearms evidence and has

---

[4] *Draughon*, No. H-02-1679, at 6-7 (internal citation omitted).

[5] A criminalist is similar to a forensic examiner, but has broader training and experience. Haag explained, for example, that a forensic examiner might work in only one unit of a crime lab, whereas a criminalist will usually have worked in all sections of the crime lab.

published several papers on firearms evidence. Haag testified that Draughon's counsel asked him to try to determine whether the fatal bullet could have hit a surface or object and ricocheted before striking Guerrero; to assess the distance from which the bullet was fired; to evaluate the quality of police investigation into Guerrero's death; and to opine on the work a ballistics expert could have done at the time of Draughon's trial. Haag testified that there were criminalists doing such work at the time of Draughon's trial.

Haag tested a Raven .25 pistol with a magazine and a single live round of ammunition and examined a fired bullet. Haag examined the rifling characteristics against those on the fired bullet, which was retrieved from Armando Guerrero's body. Haag noted damage to the fired bullet in the ogive area – the narrower part of the bullet that does not come into contact with the gun barrel. He observed heavy striations over the length of the bullet. Haag testified that the damage was caused by the bullet impacting a flat, unyielding, abrasive surface. Haag concluded that this damage occurred *after* the rifling marks were made, meaning that the striations occurred after the gun discharged the bullet. Haag concluded that this damage was a consequence of the bullet ricocheting off a hard, flat, unyielding surface, such as concrete or asphalt. Haag also concluded that the bullet had struck this hard, flat surface at a low angle, estimating it to be five degrees or less, and deflected or ricocheted off this surface before striking Guerrero. Haag opined that this damage would be obvious to any competent firearms examiner.

Haag also examined the bullet under a scanning electron microscope ("SEM"). He explained that the SEM gives an examiner greater depth of field and a better view of any particles transferred to the bullet from a ricochet surface. Haag found many grains of mineral materials embedded in the bullet. Specifically, he found grains of quartz and silicon dioxide, which he identified as sand. He also found grains containing silicon, aluminum, and calcium. Sand is found in concrete, and silicon, aluminum, and calcium are found in stones, asphalt, or concrete. Haag testified that the presence of the particles support the conclusion that the bullet hit and ricocheted off an abrasive surface before striking Guerrero.

7

Haag also studied the report of the autopsy performed on Armando Guerrero and testified that autopsy findings were consistent with the findings of ricochet damage to the bullet. The autopsy report stated that the bullet entered Guerrero's body pointing up and to the side. The bullet traveled between two ribs, grazed the heart and stopped inside the chest cavity, penetrating only a few inches into Guerrero's body. Haag testified that a bullet entering soft tissue will ordinarily penetrate ten to twelve inches. If the bullet has ricocheted, however, it will "tumble" rather than going [sic] straight, and will not penetrate as deeply as it would with a direct shot. A "tumbling" bullet will also cause an asymmetric abrasion rim on the entrance wound, which was found on Guerrero's body. Haag ran tests on ordnance gelatin and other tissue stimulant to confirm these conclusions.

Haag also calculated the approximate distance between Draughon and Guerrero when Draughon fired the gun. Haag estimated that the bullet struck an object or surface[6] at approximately a five degree angle and ricocheted. Haag based the estimate on the condition of, and markings on, the bullet. When a bullet strikes the ground at a five-degree angle, it ricochets from the ground at an angle of one to two degrees. The autopsy report stated that the bullet struck Guerrero at a point on his body approximately forty-seven inches above the ground. Based on these figures, Haag calculated the distance the bullet traveled before striking the ground or object from which it ricocheted and the distance the bullet traveled after striking the ricochet surface but before hitting Guerrero. Haag estimated that Draughon stood from thirty to one hundred yards from Guerrero when he fired the gun. Haag could not be more precise about the distance from which Guerrero was shot because the evidence conflicted as to whether Draughon was on the ground or on the truck bed when he fired the gun. In addition, Haag had no information as to whether Guerrero was standing straight up or stooping when he was shot. As a result, Haag could only provide estimates of the impact and departure angles of the bullet.[7]

---

[6] Based on his review of the crime scene, Haag concluded that the ricochet surface was most likely the ground, but he did not definitely rule out the possibility that the bullet ricocheted off another surface, such as a wall.

[7] *Draughon*, No. H-02-1679, at 19-22 (internal citations omitted) (emphasis in original). The district court misreads Haag's testimony regarding the distance the bullet traveled before striking the victim. While admitting that

Our question is whether the adjudication of the claim by the State court "'(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'"[8]

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.[9] Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case.[10]

---

certain factors may affect the distance the bullet traveled, Haag gave conservative estimates based on the likely position of Draughon and the victim when the shooting occurred. He testified that the distance from Draughon to the point of ricochet ranged from fifteen to twenty yards, while the distance from the point of ricochet to the victim could range from thirty to thirty-seven yards.

[8] *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir.) (quoting 28 U.S.C. §2254(d)(1)-(2)), *cert. denied* 537 U.S. 953 (2002).

[9] *(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir. 2001).

[10] *(Terry) Williams*, 529 U.S. at 407-09; *Hernandez*, 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.[11] Rather, federal habeas relief is only merited where the state court decision is both "incorrect *and* objectively unreasonable."[12] Finally, in "evaluating the district court's resolution of the merits of issues presented to it, we review the district court's findings of fact for clear error and its conclusions of law de novo."[13]

The state court rejection of Draughon's claim that his counsel was ineffective in failing to obtain forensic examination of the path of the fatal bullet is measured by the two-prong test of *Strickland v. Washington*[14]--the objective reasonableness of the decision to not pursue forensic examination and its prejudicial effect.[15] The first inquiry asks whether counsel's performance "fell below an objective standard of reasonableness" as measured by

---

[11] *(Terry) Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620 (5th Cir. 2001).

[12] *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004).

[13] *Nixon v. Epps*, 405 F.3d 318, 322 (5th Cir. 2005).

[14] 466 U.S. 668 (1984).

[15] *Id.* at 687.

10

"prevailing professional norms."[16] The second inquiry asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[17] We conduct these inquiries against the overarching principle of a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance,"[18] and ultimately through the prism of AEDPA. In our analysis we do not attempt to place the events of trial into two separate airtight containers of the first and second prongs of Strickland. The facts that demonstrate a reasonable probability of a different outcome but for counsel's decisions can cast light on their reasonableness.

### III

Draughon attempted to develop his ineffective assistance claim before the state habeas court, but was denied access to the ballistics evidence despite affidavits from the chief and deputy medical examiners of Bexar County expressing their view that forensic examination was necessary because the limited evidence that was available raised the possibility of a ricochet. The state habeas court did not hold an evidentiary hearing and adopted the

---

[16] *Id.* at 688.

[17] *Id.* at 694.

[18] *Id.* at 689.

State's proposed findings of fact and conclusions of law, including a ruling that "[c]ounsel cannot be held ineffective based on possibly differing expert opinions concerning the trajectory of the bullet."[19] The Texas Court of Criminal Appeals by per curiam order denied relief based "upon the trial court's findings and conclusions and our own review."[20]

The federal district court conducted a full evidentiary hearing and entered her findings in a comprehensive memorandum opinion.[21] The crux of her holding was that the evidence offered by Haag should have been presented in the state trial. The court found that had this evidence been adduced at trial, it would have directly confronted the state's core theory that Draughon turned and shot Armando in the chest from a distance of about ten running steps, a deliberate act that defies Draughon's claim that he did not intend to kill and was firing *over the heads* of his pursuers. The federal district court ultimately concluded that the state habeas court's rejection of the *Strickland* claim was an unreasonable application of federal law.

A

---

[19] *Ex parte Draughon*, No. 463658-A, at 28 (338th Dist. Ct., Harris County, Tex. Jun. 28, 2000) (unpublished) (findings of fact and conclusions of law).

[20] *Ex parte Draughon*, No. 27,511-02.

[21] Since Draughon did not "fail" to develop the factual basis of his claim in state court the federal hearing was not barred by 28 U.S.C. 2254 (e)(2)

12

We turn first to the performance prong of the *Strickland* test. There is little question that Haag presented a strong case that the fatal bullet struck the pavement in front of the victim and was fired at a much greater distance than the ten or so running steps estimated by Eva Cuellar.  The importance of this testimony cannot be overstated. Competent counsel would have been keenly aware of its importance and what would follow without it, the prejudice to Draughon. Predictably, the skilled prosecutor made the distance between the shooter and the victim the central theme of her argument at Draughon's trial that he intended to kill, and that he should receive the death penalty.  For example, she argued:

> but that first shot, that first shot was intentional and it was so quick that all Armando had time to do was to duck slightly. It happened so quick the man couldn't defend himself. He was just standing there. The man shot him like, just like men shoot a bird or animal . . . . And indeed didn't it turn out to be a perfect shot?  A shot right through the heart.

This suggestion that the distance between victim and shooter was small rests largely on the testimony of Eva Cuellar.  Her admirable traits of hard work, devotion to her children and simple sincerity made her a compelling witness. It was here that the absence of a counter-theory of greater distance supported by forensic evidence took its toll as it left her testimony largely unchallenged, relinquishing  openings for questioning the accuracy of her testimony.  And there were obvious opportunities lost. First, she was not a detached passerby but a participant in the

13

fast unfolding events.  Moreover, she was an extremely *agitated* observer.  When Draughon burst suddenly through the back door, Ms. Cuellar was under the impression that he had harmed her two children.  Her focus was on apprehending Draughon or exacting some revenge.  She was the only witness who did not duck.  Rather, she was so angry that, disregarding risk to herself, she chased after him and, in frustration, flung a knife in the direction of his fleeing figure.

There was yet another significant lost opportunity.  Ms. Cuellar had been in the United States for twenty-five years.  She had no formal education and could not read or write in English or Spanish. Her lack of formal education made communication with counsel difficult, as a reading of the transcript makes plain. The trial testimony supporting the "ten running steps"-theory bears direct quotation:

> Q:  Now, when the man came running out and he shot, how many steps or how far did he go before he shot?
>
> A:  I don't know, some eight feet, nine feet; I don't know.
>
> Q:  Past Armando, I'm sorry, past the man you were standing by?
>
> A:  Yes.
>
> Q:  Are we talking about eight or nine feet rulers or are we talking about eight or nine running steps?
>
> A:  Well, as I no (sic) nothing about that I believe it's about or nine steps or a little more. I don't know.

14

Q: About ten steps maybe?

A: Yes.

Q: Just approximately?

A: Perhaps.

Q: And then after he went about nine steps or so, running steps, then what did the robber do?

A: He turned and shot.

When defense counsel asked Ms. Cuellar to point out locations on a diagram, the prosecutor asked to take the witness on voir dire and, out of the presence of the jury, properly disclosed to the court:

> I think that Eva is very honest about what she does and doesn't understand and I certainly don't want to embarrass her, but, I don't think she feels embarrassed but I tried to show her a diagram, Your honor, and she simply told me over and over she just couldn't understand it but she can explain from the pictures, but she can't understand the diagram.

When defense counsel showed Ms. Cuellar a diagram she replied, "I don't understand that thing at all, not at all. You can tell me a thousand times about that thing. I just don't understand." Counsel then moved to photographs which she was able understand.

The absence of the evidence outlined by Haag left Draughon as the sole source of evidence available to contradict the accuracy of Ms. Cuellar's testimony. Reasonable counsel would have known the high price Draughon would pay for taking the stand to tell his version of the shooting. And he did not testify until the punishment phase, leaving his contention that he was innocent of

15

capital murder without footing. Then, when he did take the stand, the prosecutor ridiculed as ludicrous Draughon's testimony that he fired from the back of the truck, telling the jury: "We know that all the scientific evidence agrees with the things [Guerrero and Eva Cuellar] have been telling us . . . . There is absolutely no physical evidence to support his version of the facts. I would submit to you that you are going to have to answer number 1 yes because deep down all twelve of you believe Eva and believe Ricardo . . . ." Moreover, the prosecution had a murder victim who had placed himself in harm's way in an effort to assist Ms. Cuellar and the victims of the robbery in progress.

The State answers that counsel made a strategic decision not to seek forensic evidence regarding the ricochet. Relatedly, the State urges that such evidence would have undermined the defensive theory that Draughon was attempting to fire over the heads of the pursuers. Pointing to Draughon's testimony that he did not fire until after he had jumped into the back of the getaway truck, and was being jostled by the truck as he fired four shots in an effort to slow the pursuit, the State counters that if Draughon were in the truck he would have had no reason to fire any shots given that he had effectively made his escape. Moreover, the State observes that the jury could have concluded that Draughon intended to kill from his firing four to six times in disregard for life after the threat of pursuit had ended.

16

Although Draughon's state trial counsel filed a total of three affidavits, they did not assert that they made a "strategic decision" not to develop forensics. They offered little more than conclusory assertions beyond reciting that they had visited the murder scene and searched for shell casings and bullet strikes. Contrary to the State's contention that the ricochet theory came later, defense counsel were well aware that the trajectory of the bullet could be critical, and examined members of the venire about it. Specifically, they posed hypotheticals to explain to the venire that if a warning shot fired into the rafters ricochets and kills, "under the law, that is not capital murder." The state concedes, as it must, that counsels' investigation did not include forensic assistance or other examination of the ballistics or trajectory of the fatal shot. Rather, it urges that counsel reached a strategic decision not to "retain an expert to investigate and offer an opinion regarding the distance and direction from which Draughon fired the fatal shot."

The difficulty with these contentions is that they do not confront the reality that the failure to investigate the forensics of the fatal bullet deprived Draughon of a substantial argument, and set up an unchallenged factual predicate for the State's main argument that Draughon intended to kill. It left little with which to persuade the jury that Ms. Cuellar's statement of distance was faulty. As we have observed, Draughon became the sole source of evidence available to counter the prosecution's theory. In these

17

observations we look at what might have been, not to judge the performance of trial counsel by failures of strategic decisions reasonable when made, but to meaningfully examine whether counsels' failure to investigate was based on a "reasonable decision" that made such an investigation "unnecessary."[22]

To those familiar with the evidence in the case, the centrality of distance from shooter to victim is plain. The prosecutor in the case expressed concern that the State was not preparing to challenged the testimony of Haag. She expressed the view that such a challenge was essential because evidence of a ricochet "would have been very important evidence;" that if such evidence were true, failure to present the evidence could have constituted ineffective assistance. Her views were prescient. On this record we have no hesitation in concluding that the state court unreasonably applied settled federal law, the first element of *Strickland*. In this conclusion we have traveled much of the distance toward a conclusion that *Strickland*'s second prong was also unreasonable rejected. We repair to many of the same facts with our focus upon the factually interrelated question of prejudice.

B

Answering the question of prejudice as measured by *Strickland* and filtered through our narrowing-prism of the reasonableness of

---

[22] *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

18

its application by the state court warrants additional examination of events at trial. On doing so, we agree with the judgment of the federal district court that the state court rejection of Draughon's habeas petition cannot be reasonably defended on the basis that there was no reasonable probability of a different result had counsel obtained the forensic testimony.

The prosecution offered the jury a portrait of a ruthless and cruel individual engaged in a reckless spree of robbing Long John Silver's restaurants. The prosecution offered the jury evidence that the police caught Draughon as he fled a robbery of another Long John Silver's restaurant, much like the robbery resulting in the death of Armando Guerrero. In both cases, Draughon brandished a gun as he fled. In the second robbery, the arresting officer stopped Draughon only by shooting at him, thinking Draughon was about to fire at him over his shoulder as he ran from the restaurant. The police bullet missed Draughon, but caused him to surrender.

It bears emphasis that the absence of forensic evidence facilitated the State's deft portrait of a violent young man. Without the forensic testimony, only Draughon could counter the State's short-distance-to-victim thesis. When he took the stand in the punishment phase, he paid dearly for it. The prosecutor on cross-examination marched him through the details of his rape of one of his robbery victims, a restaurant worker, details the prosecutor in deference to the victim had not elicited from her in

19

her earlier testimony. The prosecutor forced Draughon to relate how he took a knife and cut the skirt and underclothing from the rape victim in a sadistic manner, had sex with her, and violated her with a broom handle. Pressed on cross-examination to explain the "why" of his conduct, Draughon had no explanation, implying at one point that the sex was consensual.

This was important evidence, but it does not counter Draughon's claim of a reasonable probability of a different outcome had he had at trial the forensic evidence developed in federal habeas. While this evidence of Draughon's serial robberies, the rape, and his arrest supported the State's argument for a "yes" answer to the question of future dangerousness in the punishment phase, it does not soften the impact of counsel's failure on the determination of guilt.

The State urges that the federal district court went awry in its application of *Strickland* by failing to examine the case within the frame of trial preparation and execution. The State is on solid ground in pointing to risks inherent in the retrospective examination of what should have been done aided by knowledge of how it all played out. This risk, coupled with the deference to the adjudication by the State courts required by Congress and general principles of comity and federalism, demands that federal courts be sensitive to unwittingly harsh judgments of choices made by lawyers in the heat of trial--choices that were not so clear at the

20

time as they often become with hindsight.  This said, we are persuaded that the district court's judgment granting relief must be affirmed for essentially those reasons stated by that court.

## IV

The State does not oppose the grant of a certificate of appealabilty on Draughon's claim that the jury could not give effect to his evidence of abuse as a child and "dysfunctional upbringing" in violation of *Penry v. Lynaugh*.[23]  We grant the certificate but conclude that under controlling precedent it is lacking in merit. The jury could have given it effect under the future dangerousness special issue. It was admitted at trial and subjected to no screens such as "constitutional relevance."

## V

For the foregoing reasons, the judgment of the district court granting relief is AFFIRMED.

---

[23] 492 U.S. 302 (1989); *see Smith v. Texas*, 125 S. Ct. 400 (2004); *Tennard v. Dretke*, 124 S. Ct. 2562 (2004).

21