AP-77,046
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/26/2015 8:31:03 PM
Accepted 1/27/2015 8:04:37 AM
ABEL ACOSTA
CLERK

**No. AP-77,046**

_____

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

_____

## HENRY W. SKINNER,
### Appellant,

### v.

## THE STATE OF TEXAS,
### Appellee,

_____

On Appeal from the Finding under Tex. Code Crim. Proc. art. 64.04
by the 31st District Court of Gray County, Texas
Hon. Steven R. Emmert, Judge Presiding

_____

## BRIEF OF APPELLEE

_____

**FRANKLIN McDONOUGH**
District Attorney
31st Judicial District
SBOT 24049034
P.O. Box 1592
Pampa, TX 79065
(806) 669-8035
(806) 669-8050 fax
Franklin.McDonough@graycch.com

*Lead Counsel

**EDWARD L. MARSHALL**
Chief, Criminal Appeals Division
Office of the Texas Attorney General
SBOT 00797004
edward.marshall@texasattorneygeneral.gov

**KATHERINE D. HAYES***
Assistant Attorney General
Criminal Appeals Division
SBOT 00796729
Office of the Texas Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400
(512) 320-8132 fax
katherine.hayes@texasattorneygeneral.gov

**The State requests oral argument**.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . 2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      The Evidence at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Post-conviction DNA Testing and Results . . . . . . . . . . . . . . . . . . . . . 11

        A.      DNA testing under the joint agreement of the parties . . . . . . . . . . . 11

        B.      Post-conviction DNA testing results . . . . . . . . . . . . . . . . . . . . . . . 15

                1.      DNA testing of evidence connected to Twila Busby
                        revealed no foreign DNA except for Appellant's. . . . . . . . . . 15

                2.      DNA testing identified Appellant's DNA profile in 20
                        locations including mixed profiles with both stabbing
                        victims on the bloody knife. . . . . . . . . . . . . . . . . . . . . . . . 17

                3.      Except for the mixture of profiles on the bloody knife,
                        DNA results were largely consistent with the victims'
                        profiles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                4.      Only 2 unknown DNA profiles were identified during
                        testing on a high-traffic area of carpeting in the boys'
                        bedroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.  The Convicting Court Did Not Legally Err in its Review of DNA Test
    Results Under Article 64.04. (Reply to Appellant's Claims 1-4) . . . . . . . . 23

    A.  Standard of review (Reply to Claim 1) . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.  Standard for a favorability finding (Reply to Claim 2) . . . . . . . . . . 23

    C.  The convicting court's ultimate finding is not based on legal
        error. (Reply to Claims 3 & 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.  No legal error exists in the convicting court's affirmative
            restatement of article 64.04. (Reply to Claim 3) . . . . . . . . . . 26

        2.  No legal error exists in the convicting court's making
            credibility determinations. (Reply to Claim 4) . . . . . . . . . . 28

II. The Convicting Court Did Not Err in Finding that Post-conviction DNA
    Testing Results are Not Favorable to Appellant. (Reply to Appellant's
    Claims 5 & 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A.  DNA results obtained on three hairs from Twila Busby's hands do
        not support a reasonable probability of Appellant being acquitted
        had this evidence been available at trial. (Reply to Claim 5(a)) . . . 30

    B.  The absence of the victims' DNA profiles on Appellant's bloody
        hand prints and fingerprints does not affirmatively cast doubt on
        the validity of Appellant's conviction. (Reply to Claim 5(b)) . . . . . 35

    C.  The absence of Appellant's DNA profile on testing the blanket
        covering Randy Busby's body is not favorable evidence under
        article 64.04. (Reply to Claim 5(c)) . . . . . . . . . . . . . . . . . . . . . . . . 38

    D.  The presence of extraneous alleles on a dishtowel is not evidence
        that affirmatively casts doubt on the validity of Appellant's
        conviction. (Reply to Claim 5(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

E. The cumulative effect of the above-described DNA testing results is not sufficient evidence to warrant a favorable finding for Appellant under article 64.04. (Reply to Claim 6) . . . . . . . . . . . . . . 42

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# INDEX OF AUTHORITIES

**Cases**                                                                                                            **Page**

*Ex parte Gutierrez*, 337 S.W.3d 883
    (Tex. Crim. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34, 41

*Frank v. State*, 190 S.W.3d 136
    (Tex.App.–Houston [1st Dist.] 2005, *pet. ref'd*) . . . . . . . . . . . . . . . . . 23, 26

*Hicks v. State*, 151 S.W.3d 672
    (Tex. App.—Waco, 2004, *pet ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Holberg v. State*, 425 S.W.3d 282
    (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29

*Johnson v. State*, 183 S.W.3d 515
    (Tex. App.—Houston [14th Dist.] 2006, *pet. dismissed*) . . . . . . . . . . . 24, 37

*Kutzner v. State*, 75 S.W.3d 427
    (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Linney v. State*, 413 S.W.3d 766
    (Tex. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Rivera v. State*, 89 S.W.3d 55
    (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 29

*Skinner v. State*, 956 S.W.2d 532
    (Tex. Crim. App. 1997), *cert. denied*, 32 U.S. 1079 (1998) . . . . . . . . . . . . . 1

*Skinner v. State*, 122 S.W.3d 808
    (Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Skinner v. State*, 293 S.W.3d 196
    (Tex. Crim. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Skinner v. Quarterman*, 576 F.3d 214
    (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Smith v. State*, 165 S.W.3d 361
    (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Whitfield v. State*, 430 S.W.3d 405
    (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wyatt v. State*, 23 S.W.3d 18
    (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Statutes, Rules and Constitutional Provisions**

Tex. R. App. P. 9.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Tex. R. App. P. 9.4(i)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Tex. R. App. P. 9.4(i)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Tex. Code Crim. Proc. art. 64.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 39

Tex. Code Crim. Proc. art. 64.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

No. AP-77,046

_____

IN THE COURT OF CRIMINAL APPEALS OF TEXAS
_____

HENRY W. SKINNER,
Appellant,

v.

THE STATE OF TEXAS,
Appellee,

_____

On Appeal from the Finding under Tex. Code Crim. Proc. art. 64.04
by the 31st District Court of Gray County, Texas
Hon. Steven R. Emmert, Judge Presiding

_____

**BRIEF OF APPELLEE**
_____

To the Honorable Justices of the Court of Criminal Appeals:

**STATEMENT OF THE CASE**

Appellant, a convicted capital murderer under sentence of death,[1] appeals the

finding made by the 31st District Court of Gray County after an examination of the

results of post-conviction DNA testing, that the results are not favorable to him

---

[1]     In 1995, Appellant was convicted of capital murder and sentenced to death for
the murders of Twila Busby and her sons, Elwin Caler and Randy Busby, on or about
December 31, 1993. This Court affirmed the conviction and sentence. *Skinner v. State*, 956
S.W.2d 532 (Tex. Crim. App. 1997), *cert. denied*, 532 U.S. 1079 (1998).

pursuant to article 64.04 of the Texas Code of Criminal Procedure. (Record 154-86).[2]

In its "Order Adopting State's Proposed Findings," entered on July 15, 2014, the convicting court specifically ruled that "DNA testing results are not favorable to [Appellant] because, had the results been available during the trial of the offense, it is reasonably probable that [he] would nevertheless have been convicted." (Record 186). On August 11, 2014, Appellant filed notice of direct appeal. (Record 187-88).

## STATEMENT REGARDING ORAL ARGUMENT

This case involves an extensive factual record and issues of first impression regarding the standard of review. Under such circumstances, the State requests oral argument believing it would significantly assist the Court in its decisional process.

## ISSUES PRESENTED

I.     Did the convicting court apply the proper legal standard under Tex. Code Crim. Proc. art. 64.04 when it found "had the results of post-conviction DNA testing been available during the trial of the offense, it is reasonably probable that [Appellant] would nevertheless have been convicted"?

II.    Did the convicting court err in finding that post-conviction DNA testing results are not favorable to Appellant?

---

[2]     "Record" is the clerk's record of pleadings and orders in this DNA appeal, followed by page reference. "Hearing Tr." is the DNA evidentiary hearing transcript of testimony and exhibits. Citations are preceded by volume number and followed by page reference or exhibit number with "SX" or "DX" for the State's, or Defendant's, exhibits.

## STATEMENT OF FACTS

## I. The Evidence at Trial[3]

Appellant lived with his girlfriend, Twila Busby, and her two sons, 22-year-old Elwin Caler and 20-year-old Randy Busby.[4] Around midnight on New Year's Eve of 1993, Twila, Elwin, and Randy were murdered in the home they all shared with Appellant in Pampa, Texas.

Around 9:30 on the evening of December 31, 1993, Twila and Appellant called a friend of Twila's, Howard Mitchell, and told him they wanted to go to his New Year's Eve party, but needed a ride. (26 RR 573, 574-75, 601-03). When Mitchell arrived between 10:15 p.m. and 10:30 p.m., he found Appellant passed out on the couch in the living room. (26 RR 575-76). Mitchell tried to rouse Appellant but had no success. (26 RR 577). Mitchell testified that Twila was a little frustrated (26 RR 604) and apprehensive, perhaps because if Appellant woke up and found her gone, then she would be in trouble and Appellant would be mad over it. (26 RR 605).

---

[3] In referencing the record on direct appeal of Appellant's conviction and sentence (AP-No. 72,131), "CR" is clerk's record, "RR" is the reporter's record of testimony and exhibits, and "STX-" or "DTX-" are the State's, or the Defendant's, trial exhibits.

[4] Elwin was "a little slow," a "bad diabetic" and had muscular dystrophy, whereas Randy was mentally retarded. (27 RR 770-71).

Michell and Twila eventually left Appellant on the couch and went to Mitchell's trailer where a party was already in progress. (26 RR 577-78, 611). Twila's uncle, Robert Donnell, was at the party. (26 RR 613-14; 29 RR 1273). Donnell had been drinking vodka and when Twila arrived, he started following her around which agitated Twila. (26 RR 620; 29 RR 1277-78, 1281). Twila only stayed at the party for maybe 30 to 45 minutes before asking Mitchell to take her home. (26 RR 578, 613, 629; 29 RR 1275). She looked fidgety and worried, and anxious to get back. (26 RR 629, 630). Sara Mitchell, Howard's daughter, testified that Twila "wanted to go home to [Appellant] because he might be mad at her if she was gone very long." (29 RR 1279).

Mitchell drove Twila home[5] between 11:00 p.m. and 11:15 p.m. and they sat in his car for a few minutes parked in the driveway. (26 RR 578-80, 630). He wished Twila a Happy New Year and gave her a quick kiss, then Twila got out of the car and went inside. (26 RR 579-80, 630).[6] Mitchell then drove home. (26 RR 580).

---

[5]     Appellant states "Mitchell 'sensed that Donnell would be a danger,' and when Mitchell agreed to take Twila home around 11:15 p.m., he noticed that she was 'fidgety and worried.'" Appellant's Br. 14 (quoting 26 RR 618, 629). The quoted passages are taken out of context. Mitchell's remark concerned his general impression of Donnell after Donnell's release from prison and not Donnell's attitude or behavior around Twila at the New Year's Eve party as Appellant seems to suggest. (26 RR 618).

[6]     About a month before the murders, Appellant told Mitchell that he loved Twila, but he would kill her if she was unfaithful to him. (26 RR 594).

At around midnight, Elwin appeared on a neighbor's front porch, clad only in his underwear and bleeding from stab wounds from which he subsequently died. (24 RR 49-50, 54; 28 RR 1193, 1207-08; 34 RR at STX-10, -173). Police dispatched to scene found a trail of blood spots leading from the front porch of the Busby residence, a large blood smear on a glass storm door that was latched from the inside, and a bloody knife (STX-53A) on the porch floor. (24 RR 94, 97-99, 103-06, 108-12, 117).

Entering the residence, officers found Twila dead on the living room floor, laying on her back in a pool of blood. (24 RR 117, 142-43; 34 RR at STX-22). It was later determined that she had been strangled into unconsciousness and subsequently beaten at least fourteen times about the face and head with a club. (28 RR 1170-71, 1174-75, 1179-82, 1186-90; 34 RR at STX-166, -172). A wooden axe handle matted with blood and hair was found leaning against the couch near Twila's body (STX-50), and a black plastic bag (STX-120)[7] with a knife (DTX-3) and a wet rag with brownish stains on it (SXT-108) was in front of the couch. (24 RR 163, 165-68; 25 RR 397-99, 415-16, 418, 463; 34 RR at STX-22, -23). Down the hall in the bedroom, officers found Randy's body laying face down on the upper bunk bed, covered by a blood

---

[7]     A hand print was found on the black plastic trash bag that was determined not to belong to Appellant. (27 RR 915-16). The Court should take judicial notice that in 2004, Appellant was granted leave to obtain the plastic bag and a sample of fingerprints from Donnell. *Skinner v. Cockrell*, No. 2:99-CV-0045 (N.D. Tex.) (ECF 72: Order Granting Leave to Conduct Discovery). Appellant has never disclosed the results of the comparison.

spotted blanket. (24 RR 119-20, 131-32; 34 RR at STX-33, -34). He had been stabbed three times in the back, with one wound piercing his heart. (28 RR 1197-99; 34 RR at STX-174). Autopsy evidence showed all of the murders to have been committed in the same general time frame. (29 RR 1260).

While the police were investigating the murders, Appellant was at the home of a former girlfriend, Andrea Reed, who lived three-and-a-half blocks away. (26 RR 506). Reed testified that Appellant banged on the door of her trailer house shortly after midnight. (26 RR 488-90). She told him to leave, but he entered the house and said, "They're out to get me, they're shooting at me." (26 RR 490-91, 518). Appellant told Reed that she had to help him because he had been shot and stabbed in the shoulder, chest, and stomach. (26 RR 491). There was a lot of blood on Appellant's shirt and right pants leg. (26 RR 492-93). Appellant removed his shirt, but Reed could find no injuries on his body except for a badly bleeding cut in the palm of his right hand. (26 RR 492-94, 520). Appellant asked Reed to suture his wound and when she agreed to do so, he heated up and bended sewing needles for her to use. (26 RR 494).

At some point, Reed attempted to leave the room to call the police, but Appellant stopped her and threatened to kill her if she did so. (26 RR 496-97, 498). When Reed told Appellant she needed to go and call Twila to find out what was going on, he told her not to call Twila or anyone. (26 RR 499-500). Appellant

-6-

conversed with Reed for several hours during which he made a series of inconsistent statements about the source of his injury and events in the past that never happened. (26 RR 488, 491, 495-500, 504, 522).[8] Eventually, Appellant offered to tell Reed what really happened if she would promise not to reveal it to anyone. (26 RR 500-01). When Reed promised not to tell, Appellant stated that he thought he had killed Twila by kicking her to death. (26 RR 501).

The police located Appellant at Reed's house before 3:00 a.m.. (25 RR 354). When Appellant heard their car pull up, he told Reed, "It's the law." (26 RR 502; 27 RR 790). Reed told him to leave but he went down the hallway and into her bedroom. (26 RR 503). Officers found Appellant there standing in a closet, wearing blood-stained socks and blue jeans. (25 RR 357-59, 363-64). Appellant appeared to be intoxicated. (25 RR 204). When officers arrested him and told him it was on prior outstanding warrants, Appellant responded, "Is that all?" (25 RR 361-62, 365). Appellant was taken to a hospital to attend the cut to his hand and while there, he gave the police a sample of his blood at 5:32 a.m.. (24 RR 195; 27 RR 809-11, 944-

---

[8] Appellant claimed that an unspecified "they" were out to get him and had shot and stabbed him several times; that two Mexicans suddenly appeared at the front and back doors of Twila's home wielding knives and had cut Appellant when he threw up his hand; that Appellant found Twila in bed with her ex-husband and the men had gotten into a fight; that Ricky Palmer broke into the house; and that cocaine dealers were looking for Twila because she owed them money. (26 RR 491, 495-96, 500).

45; 34 RR at STX-40, -47). Toxicological tests showed Appellant had 0.11 milligrams of codeine per liter of blood and a blood alcohol level of 0.11 percent. (27 RR 945; 28 RR 1071).

On January 4, 1994, Appellant voluntarily gave a tape recorded statement to police in which he claimed to remember little of what happened on the night of the murders after he fell asleep on the couch in the living room. (34 RR at STX-59 at 3-4). However, he did recall waking up on the couch at Twila's and noticing his bottle of vodka was missing. (STX-59 at 4). He thought that Twila may have gone to Howard Mitchell's house and he did not want her to visit Mitchell because she always got drunk and "screwed up" there. (STX-59 at 4). He also thought that Twila may have come home drunk and cut him with a knife, but he did not have a clear recollection of this. (STX-59 at 11).

DNA testing of blood on Appellant's clothing revealed it belonged to Twila and Elwin.[9] Two blood stains on Appellant's shirt were consistent with Twila's DNA profile while a third stain was consistent with Appellant's profile. (28 RR 1113, 1115-1119, 1125). Appellant's blue jeans had one blood stain with a mixture of DNA profiles from Twila and Elwin, and two other stains were consistent with Elwin's

---

[9]    The record on the DNA appeal shows that 278 stains tested positive for the presence of blood. (DX-32, pg. 54). Only a few representative samples were submitted for DNA testing prior to trial.

DNA profile. (28 RR 114-15, 117, 1125). A forensic scientist testified that only 1 in 5.5 billion people (at the time, the population of the earth) would have the same 7 DNA markers identified in the blood as belonging to Twila, Elwin, and Appellant. (28 RR 1125-26). Additionally, fingerprint evidence revealed that Appellant left bloody hand prints on the door frame and the door stop moulding in the bedroom where Randy was stabbed to death. (27 RR 790-91, 796, 911, 913). Appellant's bloody fingerprints were also found on the door knobs of the door leading from the kitchen to the utility room and a bloody hand print on the knob of the door exiting from the utility room into the backyard. (*Id.*).

The State's theory at trial was that Twila returned home from a New Year's Eve party to find a jealous and enraged Appellant, that Appellant choked Twila and beat her to death with an axe handle, and that Appellant killed Elwin and Randy to eliminate any witnesses. (24 RR 34-36; 30 RR 1554-58, 1613).

Appellant presented three defenses at trial. First, defense counsel argued that the State failed to uphold its burden of proof beyond a reasonable doubt because it did not forensically test some of the evidence. (30 RR 1567-86). Second, defense counsel painted Twila's uncle, Robert Donnell, as an alternate suspect who could have committed the murders. (30 RR 1588-90). The jury heard testimony that a drunken Donnell followed Twila around at the New Year's Eve party, was known to

carry a knife, was quick-tempered, and had been violent with women before. (26 RR 614, 616-17; 29 RR 1281, 1297-1301). Third, defense counsel presented evidence that Appellant was too incapacitated by his intoxication to have committed the murders.[10] Dr. William Lowry, the defense toxicologist, testified that most people at Appellant's level of intoxication would be comatose or asleep, and in any event, between midnight and 3:30 a.m., Appellant would have been in a stupor, with impaired consciousness, general apathy, and an inability to stand or walk. (29 RR 1368-69, 1371, 1375). Dr. Lowry believed Appellant was too intoxicated to walk, much less travel to different rooms to kill the victims. (29 RR 1376, 1384-85). However, Dr. Lowry was surprised by what Appellant was able to accomplish on the night of the murders given the amount of Codeine and alcohol Appellant he had ingested.[11] Finally, an occupational hand therapist who specialized in hand therapy

---

[10] Appellant asserts that blood spatter evidence at trial proves Elwin was in the immediate vicinity of his mother as she was being beaten and that such evidence supports his defense theory because it means the real killer had to contend with two victims at the same time whereas Appellant was too impaired to have ever done so. Appellant's Br. 7 (citing 24 RR 216-17; 28 RR 1211; 34 RR at STX-48, pg. 2); *see id*. at 12-13. While the evidence is in the record, the spin currently placed on it by Appellant was not offered at trial. The Court should take judicial notice that "[i]n the federal habeas proceedings, appellant claimed that trial counsel was ineffective for failing to use this evidence at trial and to show it to Dr. Lowry." *Skinner v. State*, 293 S.W.3d. 196, 205 (Tex. Crim. App. 2009) (affirming denial of second motion for DNA testing, and citing *Skinner v. Quarterman*, 576 F.3d 214, 217-19 (5th Cir. 2009) (affirming denial of habeas relief on ineffective assistance claim)).

[11] For example, Appellant having the presence of mind to catch Reed on the telephone and to threaten her not to call anyone (30 RR 1476), having a very definite opinion

testified that Appellant had a previous hand injury (a knife wound) that made it unlikely he could have strangled Twila to death. (29 RR 1309-20).

At the close of evidence, the jury found beyond a reasonable doubt that Appellant was guilty of capital murder for intentionally causing the death of Twila Busby "by repeatedly striking her about the head and face" with a wooden club and, during the same transaction, causing the deaths of Elwin Caler and Randy Busby by stabbing them with a knife. (1 CR 2; 2 CR 32). Punishment was assessed at death based on the jury's answers to the special sentencing issues. (2 CR 56-57).

## II. Post-Conviction DNA Testing and Results

### A. DNA testing under the joint agreement of the parties

In September 2011, Appellant filed a third motion for post-conviction DNA testing that was subsequently denied by the trial court. *Skinner v. State*, No. 5216 (31st Dist. Ct.) (Order of Nov. 21, 2011).[12] During Appellant's appeal, the parties reached an agreement for DNA testing and jointly moved to vacate and remand. This Court, finding the agreement made resolution of the appeal unnecessary, dismissed

---

for Reed to not call anyone (*id*. at 1476-77), making his way and finding Andrea Reed's house four blocks away (*id.* at 1482-83), and after awaking on the couch, surmising Twila took the bottle of vodka with her and left him alone without anything to drink (*id*. at 1483).

[12]     This Court affirmed on appeal the trial court's orders denying Appellant's previous two motions for post-conviction DNA testing. *Skinner v. State*, 122 S.W.3d 808 (Tex. Crim. App. 2003); *Skinner v. State*, 293 S.W.3d 196 (Tex. Crim. App. 2009).

the appeal with the understanding that the parties would file their agreed Chapter 64 motion. *Skinner v. State*, No. AP-76,675, 2012 WL 2343616 (Tex. Crim. App. June 20, 2012) (order, not designed for publication).

Thereafter, the parties filed an "Agreed Joint Order of the Parties for DNA Testing" that was approved by the trial court on June 25, 2012. (Record 1-8). The Order identified 40 items that would be submitted to the Texas Department of Public Safety (DPS) Crime Laboratory in Lubbock, Texas, including Twila Busby's fingernail clippings, vaginal swabs and smears, and hair recovered from Twila's hands; blood stains on clothing and bedding; blood stains on the walls, carpeting, and doors at the crime scene; a knife and a dish towel recovered from a trash bag in the living room; and a knife recovered from the front porch of the Busby residence. (Record 1-4).

In July 2012, representatives for both parties (and a DNA expert for Appellant) met with DPS forensic scientist to assess the evidence to determine the condition and suitability for DNA testing. (3 Hearing Tr. 68-29; SX-1). John Lan Bundy, a DPS forensic scientist in trace evidence (now retired) also met with the parties and assisted Hester by screening evidence, conducting a visual and stereoscopic examination of external hair characteristics, and cataloging those results. (2 Hearing Tr. 196, 202-06,

207, 209-12).[13] Hester conducted 191 presumptive tests for the presence of blood, and 94 tests were positive. (DX-32, pgs. 110-17 [total of "PHT" tests with a "+" designation]). Hester additionally ran sperm searches and tests for sperm. No semen was detected on any of the 6 vaginal swabs and smears obtained during Twila Busbsy's autopsy, and no semen was indicated on Elwin Caler's underwear. (SX-5 & DX-10, pg. 2 [#09-01], pg. 8 [#09-23]). Based on the screening tests, the parties reached an agreement regarding which specific items would be submitted for DNA testing and agreed not to test five items after presumptive tests were negative for blood. (3 Hearing Tr. 68-69; SX-1; SX-5 & DX-10, pgs. 6 & 9).

During the first round of DNA testing, DPS forensic scientist Brent Hester conducted DNA testing on 115 samples using STR (Short Tandem Repeat) analysis. (DX-19: STR Data worksheet). In October 2012, Hester issued a report, which was later amended, summarizing the results of the sperm searches and tests for sperm, presumptive tests for blood, and STR testing. (SX-5 & DX-10).

On November 27, 2012, the trial court approved the "Agreement of the Parties for Further DNA Testing" on samples from carpeting and from a knife that would be tested using Minifiler and Y-STR DNA analysis. (Record 29-33). In February 2013,

---

[13]     Bundy completed a "Laboratory Information Sheet" (SX-2 & DX-14) and issued a "Trace Analysis Laboratory Report" (SX-3 & DX-13).

DPS forensic examiner Hester conducted STR testing on a piece of carpeting cut from around an existing stain that had previously been subjected to STR DNA testing (SX-6), thus making it a total of 116 samples that were assessed with STR analysis.[14] That same month, the DPS Crime Lab issued supplemental reports regarding the results obtained on Minifiler (SX-7 & DX-11) and Y-STR (SX-8 & DX-12) testing.

In April 2013, the trial court authorized an amended joint agreement of the parties for mitochondrial DNA testing (mtDNA) whereby the DPS Crime Lab would submit certain hairs and a sample (aka stain) from carpet to The Bode Technology Group, Inc., a private laboratory. (Record 54-55). On August 6, 2013, Bode issued a "Forensic Case Report" for mtDNA results obtained on 4 hairs. (SX-10 & DX-16).

With the conclusion of mtDNA testing, the parties advised the convicting court that all post-conviction DNA testing had concluded. (Record 74). The convicting court conducted an evidentiary hearing on February 3-4, 2014, during which it heard live testimony from Appellant's expert, Dr. Julie Heinig, and from the State's experts,

---

[14]     Some tests yielded no interpretable result or else no result was obtained. (*E.g.*, SX-5 & DX-10, pgs. 2-4 [no results on 10 hairs], pg. 5 [#09-08: no DNA result on knife from the plastic bag], pg. 6 [#09-12: no DNA results on door knobs on the outer door], pg. 7 [#09-16: no interpretable result from Fingerhut card], pg. 7 [#09-18: no DNA result from a stain on the upper outer front storm door], pg. 7 [#09-21: no DNA results from a pair of Wrangler jeans from the boys' bedroom], pg. 8 [#09-23: no interpretable profile from 3 stains on Elwin's underwear, and no result on 32 stains], pg. 8 [#09-24: no interpretable profile from Randy's underwear], pg. 9 [#09-28: no interpretable profiles from stain 2 on a sheet], pg. 9 [#09-30-AB: no interpretable DNA profiles from 4 stains on a fitted sheet], and pg. 9 [#09-31: no interpretable DNA results from a stain above the dresser]).

DPS Trace Analyst John Lan Bundy and DPS Forensic Examiner Brent Hester. After examining the DNA testing results, the convicting court issued an "Order Adopting State's Proposed Findings of Fact" that found "DNA testing results are not favorable to [Appellant] because, had the results been available during the trial of the offense, it is reasonable probable that [Appellant] would nevertheless have been convicted." (Record 186, adopting proposed findings at Record 154-85).

## B.     Results of post-conviction DNA testing

### 1.     DNA testing of evidence connected to Twila Busby revealed no foreign DNA except for Appellant's.

DNA testing conducted by DPS revealed that Twila Bubsy was not a victim of sexual assault prior to her murder. No semen was found in 6 vaginal swabs and smears collected during Twila's autopsy. (SX-5 & DX-10, pg. 2 [#09-01]). DNA testing with STR revealed a partial DNA profile on 1 vaginal swab that was consistent with Twila's DNA profile. (*Id.*).

DNA testing of fingernail clippings from Twila's right and left hands contained no foreign DNA and instead matched 2 partial DNA profiles from Twila. (SX-5 & DX-10, pg. 2 [#09-02]).

DNA testing was conducted on 18 hairs recovered from Twila's hands and underneath the ring on her left ring finger. Using STR analysis, DPS identified DNA

-15-

profiles on 8 hairs that matched Twila. (SX-5 & DX-10, pgs. 2-4). No DNA profile could be obtained from the remaining 10 hairs. (*Id*.). Bode Laboratory obtained mtDNA profiles on 4 hairs from Twila's hands. (SX-10 & DX-16). One hair from Twila's right hand contained a partial mtDNA profile that was consistent with the mtDNA profile of Appellant (and his maternal relatives). (*See id.*, pg. 3 [#CCL 1316-0099-E03]). The remaining 3 remaining hairs from Twila's hands each had partial mtDNA profiles that were consistent with the mtDNA profiles of Twila and her sons, Elwin and Randy. (*Id.*, pgs. 2-3 [#CCL 1316-0088-E01, -E02 & -E04]). Results obtained through mtDNA testing cannot distinguish between maternal relatives who inherited mitochondrial DNA from the same maternal source. (2 Hearing Tr. 40-41). As a result, a hair with an mtDNA profile matching Twila would also necessarily match the mtDNA profile of her biological children (Elwin Caler, Randy Busby, and Lisa Busby), Twila's mother (Beverly Ann Donnell Ward Clark), Twila's siblings (her sister LaDonna Ward Anderson and two brothers, Doug Ward and Rusty Ward), Twila's four maternal uncles (including Robert Donnell), and Twila's maternal grandmother. (SX-23). An mtDNA profile, standing alone, does not convey any information about the actual identity of the contributor of the hair.

**2. DNA testing identified Appellant's DNA profile in 20 locations including mixed profiles with both stabbing victims on the bloody knife**

Post-conviction DNA testing using STR and Minifiler analysis identified Appellant's DNA profile in 19 blood stains that had not been identified at the time of trial, while mtDNA testing found Appellant's mtDNA profile on a hair recovered from Twila's hand. Specifically, DNA testing revealed the following profiles from Appellant:

- 2 partial DNA profiles on a cassette tape in the boys' bedroom where Randy's body was found (SX-5 & DX-10, pg. 4 [#09-04]);

- 2 partial DNA profiles on a tennis shoe in the boys' bedroom (*id.*, pgs. 7-8 [#09-22]);

- 1 partial DNA profile on a comforter in the boys' bedroom (*id.*, pgs. 8-9 [#09-25-AB]);

- 1 partial DNA profile from a blood stain on the dresser inn the boys' bedroom (*id.*, pgs. 9-10 [#09-33]);

- 1 partial DNA profile near a bloody hand print on the door frame by the dresser in the boys' bedroom (*id.*, pg. 10 [#09-35]);

- 1 partial DNA profile on a cassette tape holder in the boys' bedroom (*id.*, pgs. 10-11 [#09-37]);

- 2 partial DNA profiles on scrapings from door knobs in the kitchen area (*id.*, pg. 6 [#09-13, #09-14]);

- 1 partial DNA profile in blood on the back door leading out of the house (*id.*, pg. 7 [#09-17]);

- 8 partial DNA profiles on the bloody knife alleged to be the murder weapon—6 swabs collected in 1994 and 2 swabs collected in 2012 at the base of the blade and on the handle of the knife (*id.*, pg. 5 [#09-07 stains 1 & 2]; *id.*, pgs. 11-12 [#09-40 stains 1, 3, 5, 6]; SX-7 & DX-11, pg. 2 [#09-07 stain 2]; *id.*, pgs. 2-3 [#09-40 stains 2, 4]); and

- 1 partial mtDNA profile consistent with Appellant (and his maternal relatives) was identified on a hair from Twila's right hand (SX-10 & DX-16, pg. 3 [#CCL 1316-0099-E03]).

Regarding the bloody knife, not only was Appellant's DNA profile identified in each of the 8 testing areas, but the blood stains included the DNA profiles of Elwin or Randy, and in some instances both. DPS collected six swabs (aka samples) from the knife prior to trial in 1994 but they were not tested for DNA. (SX-5 & DX-10, pgs. 11-12 [#09-40 Stains 1 to 6]). In 2012, the DPS Crime Lab conducted STR analysis and reported that 4 samples (Stains 1, 3, 5, and 6) had DNA consistent with a mixture of the profiles from Appellant, Elwin Caler, and Randy Busby. (*Id.*). Testing of the remaining samples (Stains 2 and 4) found DNA profiles consistent with a mixture that included Elwin Caler. (*Id.*). Further testing using Minifiler revealed Appellant to be the previously unidentified contributor to the mixture of profiles on Stains 2 and 4. (SX-7 & DX-11, pgs. 2-3 [#09-40]). Appellant's DNA was thus identified in all 6 samples originally collected in 1994 from the murder weapon.

Appellant's DNA profile also appears in both samples collected from the bloody knife by DPS in 2012. Swabbing of the knife handle (Stain 1) identified Appellant's DNA profile in a mixture. (SX-5 & DX-10, pg. 5 [#09-07]). STR testing at the base of the knife blade (Stain 2) identified a mixture of 3 contributors including Appellant and Elwin Caler. (*Id.*). Using MiniFiler, it was revealed that the third DNA contributor was Randy Busby. (SX-7 & DX-11, pg. 2 [#09-07]). Considered together, Appellant's DNA profile appears in all 8 samples collected from the murder weapon: 6 samples collected in 1994 and 2 samples in 2012. No unidentified or foreign profile was found on the murder weapon.

### 3. Except for the mixture of profiles on the bloody knife, DNA results were largely consistent with the victims' profiles.

Using STR and Minifiler analysis, DPS forensic examiner Hester identified a total of 39 DNA profiles that were consistent with the DNA profiles of the victims. (SX-5 & DX-10; SX-7 & DX-11).

Thirteen DNA profiles (12 partial and 1 complete) were consistent with Twila Busby in testing on a vaginal swab (SX-5 & DX-10, pg. 2 [#09-01]), fingernail clippings (*id.* [#09-02]), 8 hairs recovered from Twila's hands (*id.*, pgs. 2-4); a blood spot on a dishtowel (*id.*, pg. 6 [#09-09 stain 3]), blood on a door stop moulding in the boys' bedroom (*id.* [#09-10]), and the 1 complete DNA profile was found on carpet

from the entrance to the kitchen (*id.*, pgs. 6-7 [#09-15]). No foreign or unknown DNA was found mixed with Twila's DNA.

Using STR and Minifiler, Hester identified Randy Busby's DNA profile in 10 blood stains: 3 complete DNA profiles on a blanket from the top bunk bed (SX-5 & DX-10, pg. 8 [#09-25-SAA]); 2 partial DNA profiles in separate stains on carpet from the boys bedroom (*id.*, pg. 10 [#09-36]); and 5 DNA profiles in blood stains on the murder weapon that were mixed with DNA profiles from Appellant and Elwin (*id.*, pgs. 11-12 [#09-40 stains 1, 3, 5, 6]; SX-7 & SX-11, pg. 2 [#09-07 stain 2]).

Elwin Caler's DNA profile was identified in 15 blood stains including 1 partial profile on the base of the bloody knife blade that was mixed with DNA profiles of Appellant and Randy Busby (SX-5 & DX-10, pg. 5 [#09-07 stain 2]; SX-7 & DX-11, pg. 2 [#09-07]). Elwin's DNA profile was also found on all 6 swabs collected from the bloody knife by DPS in 1994.(SX-5 & DX-10, pgs. 11-12 [stains 1, 2, 3, 4, 5, 6]). Each swab had a mixture of DNA profiles that included Appellant, and four of the swabs (Stains 1, 3, 5, 6) included Randy as the third contributor. (*Id.*; SX-7 & DX-11, pgs. 2-3). Further testing revealed that Elwin's DNA profile appeared in 1 blood stain on his underwear (SX-5 & DX-10, pg. 6 [#09-23 Stain 35]), in 1 blood stain on a comforter in the boys' bedroom (*id.* [#09-25-AB Stain 1]), in 1 blood stain on the interior side of the door in the boys' bedroom (*id.*, pg. 9 [#09-32]), and in 3 samples

tested on carpeting from the bedroom (*id.*, pg. 10 [#09-36 Stain 1, 2]; SX-7 & DX-11, pg. 2 [Minifiler testing of #09-36 Stain 3]).

### 4. Only 2 unknown DNA profiles were identified during testing on a high-traffic area of carpeting in the boys' bedroom.[15]

The first unknown profile was a full DNA profile found in a bloodstain on carpet from the entranceway to the boys' bedroom. STR testing revealed a mixture of at least 3 contributors that included Randy and Elwin. (SX-5 & DX-10, pg. 10 [#09-38 stain 2]). The remaining unidentified profile was run through the State DNA Index System (SDIS) in October 2012 with no hits. (SX-4, pg. 12 ["Investigative Leads" section]; 3 Hearing Tr. 76-78, 116-19). In 2013, the DPS Crime Lab analyzed Stain 2 with MiniFiler and again found a mixture of at least 3 contributors including Randy and Elwin. (SX-7 & DX-11, pg. 2 [#09-36]). The remaining profile was again run through CODIS and obtained a match to the same profile previously submitted into SDIS. (*Id.*, pg. 3 ["Investigative leads" section]).[16]

The second unknown profile was found on an area of carpeting that was immediately adjacent to Stain 2 above. DPS forensic scientist Brent Hester cut out an area of carpet from around Stain 2 and tested the new sample (identified as "Stain

---

[15] There was an unidentified profile found on the bloody knife, but as explained in part 2 above, additional testing revealed that Appellant was the contributor.

[16] To date, the DNA profile has had no hits in CODIS.

3") with STR, but obtained no interpretable profile. (SX-6). Testing with Minifiler identified a DNA profile consistent with a mixture of 3 contributors that included Elwin but excluded Appellant. (SX-7 & DX-11, pg. 2 [#09-36]). Neither unidentified profile in the mixture was sufficient to run through CODIS. (3 Hearing Tr. 76-79).

## SUMMARY OF THE ARGUMENT

After more than 300 tests were concluded, ranging from presumptive tests for blood to sperm searches to STR, Minifiler, Y-STR and mtDNA analysis, the convicting court correctly found that DNA results did not establish a reasonable probability of a different result at Appellant's capital murder trial. The trial court's finding warrants affirmance because the DNA test results are not favorable to Appellant under any legal standard of review. Appellant's cherry picked DNA results augmented by supposition do not demonstrate error because they cannot overcome the overwhelmingly consistent DNA evidence showing Appellant murdered Twila Busby and her two sons and left his own blood—mixed with theirs—on the murder weapon and all over the crime scene. Nor do the DNA results show any plausible alternative suspect was ever there when the three victims were brutally killed.

**ARGUMENT**

**I. The Convicting Court Did Not Legally Err in its Review of DNA Test Results Under Article 64.04. (Reply to Appellant's Claims 1-4)**

**A. Standard of review (Reply to Claim 1)**

The State agrees with Appellant that this Court reviews de novo an article 64.04 finding. Appellant's Br. 15 (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002); *Frank v. State*, 190 S.W.3d 136, 138 (Tex. App.— Houston [1st Dist.] 2005, *pet. ref'd*)). For subsidiary determinations, the Court should give "'almost total deference' to the trial court's resolution of questions of historical fact and application-of-law-to-fact that turn on credibility or demeanor, but all other application-of-law-to-fact questions are considered de novo." *Holberg v. State*, 425 S.W.3d 282, 284-85 (Tex. Crim. App. 2014) (citing *Rivera v. State*, 89 S.W.3d at 59).

**B. Standard for a favorability finding (Reply to Claim 2)**

The State further agrees with Appellant that the Court "examines the entire record to determine whether the appellant established, by a preponderance of the evidence, a reasonable probability that he would not have been convicted if the post-conviction DNA test results had been available at trial." Appellant's Br. 15 (quoting *Smith v. State*, 165 S.W.3d 361, 365 (Tex. Crim. App. 2005)).[17] As the Court reasoned

---

[17]     *Smith* is an article 64.03 case, but the Court has not issued a published opinion regarding the appropriate standard for a favorability finding in the wake of its May 2014

-23-

in *Smith*, instead of proving actual innocence, an appellant "must prove that, had the results of the DNA tests been available at trial, there is a 51% chance that [he] would not have been convicted." 165 S.W.3d at 364 (discussing the bill analysis to an amendment to article 64.03 whereby the defendant no longer needed to show a reasonable probability that DNA would prove his innocence).

A reasonable probability exists when there is a probability sufficient to undermine confidence in a trial's outcome. *Rivera v. State*, 89 S.W.3d at 59. In this regard, "[a] 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Ex parte Gutierrez*, 337 S.W.3d 883, 894 n. 34 (Tex. Crim. App. 2011)(citing *Rivera,* 89 S.W.3d at 59). "If the DNA test results do not demonstrate a reasonable probability [of a different outcome], then the trial court does not err in finding those test results are 'not favorable.'" *Johnson v. State*, 183 S.W.3d 515, 520 (Tex. App.—Houston [14th Dist.] 2006, *pet. dismissed).*

Appellant maintains that article 64.04 incorporates only a "reasonable probability" standard and that a convicting court must make a favorable finding regarding DNA testing results even if the degree of doubt falls below a

---

decision that appellate courts have jurisdiction to review the appeal of an unfavorable finding under article 64.04. *Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).

preponderance of the evidence so long as the showing undermines confidence in the verdict. *See* Appellant's Br. 16-18. These assertions contradict his statement that the Court "examines the entire record to determine whether the appellant established, *by a preponderance of the evidence*, a reasonable probability that he would not have been convicted if the post-conviction DNA test results had been available at trial." Appellant's Br. 15 (quoting *Smith*, 165 S.W.3d at 365) (emphasis added).

Assuming Appellant has disavowed that portion of his standard of review, the State would challenge Appellant's assertion that he is entitled to a favorable finding under article 64.04 even if the degree of doubt falls below a preponderance of the evidence. Appellant's Br. 16. For an appellant to establish a reasonable probability that he would not have been convicted had the post-conviction DNA evidence been available, his evidence must necessarily be important. It is fully consistent with that burden to require an appellant to show that new DNA results makes this reasonable probability more likely than not. *See* Black's Law Dictionary 1182 (6th ed. 1990) ("Preponderance of the evidence" is that which is more credible and convincing to the mind."). While Appellant is correct that article 64.04 utilizes a "reasonable probability," several intermediate appellate courts have reviewed article 64.04 findings to determine whether an appellant has established, by a preponderance of the evidence, that there is a reasonable probability he would not have been convicted

because of favorable DNA test results. E.g., *Frank v. State*, 190 S.W.3d at 139 (same); *Hicks v. State*, 151 S.W.3d 672, 675-76 (Tex. App.—Waco, 2004, *pet ref'd*) (same). The State would therefore urge the Court to expressly incorporate the preponderance-of-the-evidence standard into its review.

Even if Appellant is correct that article 64.04 requires only a showing of a reasonable probability of a different outcome (with a likelihood somewhere below 50%), it would not help Appellant. As argued in the following sections, the results of post-conviction DNA testing in this case do not undermine confidence in the verdict under any legal standard.

### C. The convicting court's finding is not based on legal error. (Reply to Claims 3 & 4).

Appellant maintains that the convicting court erred by applying an incorrect legal standard and by issuing its own credibility determinations instead of viewing competing evidence "through the lens of a lay juror." Appellant's Br. 18-23. These arguments try to create error where none exists.

#### 1. No legal error exists in the convicting court's affirmative restatement of article 64.04. (Reply to Claim 3).

Appellant contends that instead of stating whether it is "reasonably probable that [he] would not have been convicted" had DNA testing results been available, which tracks the language of article 64.04, the convicting court's order states that it

was "reasonably probable that [Appellant] *would* nevertheless have been convicted" if DNA testing results had been available at trial. Appellant's Br. 18-19 (citing Record 186) (emphasis added by Appellant).[18] By Appellant's account, this language "flipped" the legal standard "squarely on its head" and required him to prove both a reasonable probability that he would not have been convicted (as required under article 64.04) and prove the absence of any probability that he would have been convicted—in other words, prove his innocence by clear and convincing evidence. Appellant's Br. 19-20.

No fundamental legal error occurred here. The trial court's conclusion—"that DNA testing results are not favorable to [Appellant] because . . . it is reasonably probable that [he] would nevertheless have been convicted"—is merely an affirmative restatement of the standard under article 64.04. (Record 186). Regardless, even if the convicting court's finding did not parallel the wording in article 64.04, any error did not harm Appellant. Contrary to Appellant's contention, the trial court's rewording did not require him to show clear and convincing evidence of innocence. Appellant's Br. 20. In reviewing whether post-conviction DNA testing results were favorable to

---

[18] The trial court used affirmative wording in its ultimate ruling (Record 186), in the introductory paragraph of the proposed findings (*id*. at 1654), and in three subsidiary determinations (*id*. at 163 [¶ 39], 175 [¶ 67], 177 [¶ 76]). However, the court also issued subsidiary determinations that track the language of Article 64.04. (*E.g*., *id*. at 158 [¶18], 168 [¶55], 169 [¶57], 171 [¶64], 175 [¶68], 179 [¶85], 180 [¶91]).

Appellant, the trial court's findings and subsidiary determinations reflect a thorough, and appropriate, consideration of whether DNA results affirmatively cast doubt upon the validity of Appellant's capital-murder conviction. (Record 154-85).

> **2.** **No legal error exists in the convicting court making credibility determinations. (Reply to Claim 4)**

As his final claim of legal error, Appellant argues the convicting court's subsidiary findings include credibility determinations that were made by the court instead of from the perspective of how "competing evidence" might have been viewed by a reasonable lay juror. Appellant's Br. 21 (citing Record 170 [¶63], 173 [¶65.C(2)], 175 [¶69]], 174 [¶66C(5)], 183 [¶102]). He asserts that the Legislature couched the Article 64.04 inquiry in terms of whether the jury would still have unanimously convicted the defendant in the face of exculpatory DNA test results and, therefore, a reviewing court must assess DNA evidence from the "more detached perspective" of a reasonable juror. Appellant's Br. 23.

No legal error exists here. Article 64.04 applies equally to requests for post-conviction DNA testing in cases where the underlying conviction was before a jury or a judge in a plea or trial to the court. However, the DNA evidentiary hearing is held before the convicting court. The court, as fact-finder, is exclusive judge of the credibility of witnesses. *See Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)

(any discrepancies or qualms about a witness' truthfulness is for the fact-finder to resolve in its role as exclusive judge of the credibility of witnesses and the weight to be given their testimony). As set forth above in the standard of review, in the context of Chapter 64 appeals, a reviewing court gives "'almost total deference' to the trial court's resolution of questions of historical fact and application-of-law-to-fact that turn on credibility or demeanor[.]" *Holberg v. State*, 425 S.W.3d at 284-85 (citing *Rivera v. State*, 89 S.W.3d at 59). There is no requirement that if a defendant seeking post-conviction DNA testing was tried by a jury, then the convicting court must necessarily word any finding on credibility in the manner currently suggested by Appellant or else face forfeiture of the deference accorded the findings. In sum, the convicting court did not legally err and Appellant fails to show otherwise.

## II. The Convicting Court Did Not Err in Finding that DNA Testing Results are Not Favorable to Appellant. (Reply to Appellant's Claims 5 & 6).

Appellant asserts that the trial court's unfavorable finding under article 64.04 failed to consider the cumulative effect of four "vital pieces of evidence" and placed "undue weight" on DNA test results that were entirely consistent with defense theories at trial. Appellant's Br. 24-44. The Court should reject his contentions because the convicting court's ultimate finding is supported by sufficient evidence under any standard of review. Considered individually or cumulatively, the DNA

testing results identified by Appellant do not undermine confidence in the verdict that

he is guilty of the capital murder of Twila Busby, Elwin Caler, and Randy Busby.

> **A.  DNA results obtained on hairs from Twila Busby's hands do not support a reasonable probability of Appellant being acquitted had this evidence been available at trial. (Reply to Claim 5(a))**

Appellant contends that post-conviction mtDNA testing of three "visually

dissimilar" hairs recovered from Twila Busby's hands has evidentiary significance

because the results could have bolstered the defense theory of an alternative

perpetrator. Appellant's Br. 24. He argues that the hairs may have been deposited in

Twila's hands "during the course of a struggler with her attacker." Appellant's Br. 24.

Appellant relies not just on the mtDNA results, but the fact that the hairs had been

characterized as being "visually dissimilar" to Appellant and the three victims. This

evidence is not favorable to Appellant.[19]

In 2012, DPS Trace Analyst Lan Bundy described a total of four hairs as being

"visually dissimilar" to known hair samples of Appellant and the three victims. (DX-

13 at items 1.6d, 1.6e3, 1.7c, and 1.9c2). The hairs were tested using mtDNA

---

[19]  The convicting court found this evidence not favorable because Appellant was mistaken regarding the nature of the hair analysis performed at the DPS Crime Lab; that neither the victims nor Appellant were excluded as contributors of the "visually dissimilar" hairs; that mtDNA profiles that matched Twila, Elwin, and Randy also matched all of Twila's maternal relatives and thus hairs were not more likely deposited by Twila's uncle Robert Donnell; and the mtDNA results on an additional hair were inculpatory because it identified Appellant's mtDNA profile. (Record 171-75 [¶¶ 64-66]).

analysis; the mtDNA profile obtained on one hair was consistent with Appellant while partial mtDNA profiles on the other three hairs were consistent with Twila (and all maternal relatives). (SX-10 & DX-16, pgs. 2-3). While Appellant acknowledges that mtDNA cannot distinguish between relatives who receive their mitochondria from the same maternal source,[20] he nevertheless argues that the results are significant. Appellant's Br. 25-26. By Appellant's account, because the hairs have mtDNA profiles consistent with Twila and her maternal relatives, yet the hairs are visually dissimilar to the victims, then the results necessarily indicate the hairs were deposited by another maternal relative, like Donnell. Appellant's Br. 26.

Appellant's contention overinflates the alleged significance of "visually dissimilar" hairs. In this case, a total of 18 hairs were recovered from Twila Busby's hands. (SX-5 & DX-10, pgs. 2-4). Post-conviction DNA testing using STR analysis revealed that 8 of the hairs had DNA profiles consistent with Twila. (*Id.*). Given the nature of Twila's death—strangulation and being beaten about the head and face with a wooden club—it should be no surprise that Twila would be the contributor of many of the hairs found in her hands. Four hairs were then submitted for mtDNA testing; one hair matched the mtDNA profile *of Appellant* (the E03 hair) while three hairs (E01, E02, and E04) had partial mtDNA profiles consistent with Twila and all her

---

[20]     Appellant's Br. 25-26 (citing Hearing Tr. 2:40-43).

maternal relatives. (SX-10 & SX-16). This mtDNA evidence does not support a reasonable probability that Appellant would have been acquitted had the testing results been available at his trial. *See* Tex. Code Crim. Proc. art. 64.04.

As an initial matter, if Appellant's proposed theory is correct—that hairs possibly were deposited in Twila's hands "during the course of a struggle with her attacker," Appellant's Br. 24, then mtDNA results are certainly not favorable. Regardless of any explanation that Appellant might offer, mtDNA testing established that one of the hairs recovered from Twila's hands was Appellant's. (SX-10 & DX-16, pg. 3 [E03 hair]). DNA results that inculpate Appellant by definition cannot be favorable under Article 64.04.

Results from mtDNA testing on the 3 hairs that revealed mtDNA profiles consistent with Twila and her maternal relatives are also not favorable to Appellant. (SX-10 & DX-16, pg. 3 [E01, E02, and E04 hairs]). Appellant's supposition regarding the hairs is based almost exclusively on their being "visually dissimilar" to the victims (and to Appellant for that matter). *E.g.*, Appellant's Br. 24, 26, 28. The statement, made by DPS Trace Analyst John Lan Bundy, does not merit the significance currently proposed by Appellant.

During the DNA evidentiary hearing, Appellant's expert Dr. Julie Heinig opined that the designation of "visually dissimilar" meant the DPS Crime Lab had

excluded the victims as possible contributors of the hairs. (2 Hearing Tr. 37-46).

However, DPS Trace Analyst Bundy explained that the phrase "visually dissimilar" has a very different meaning from "exclusion"; that "visually dissimilar" refers to features that can be observed without the aid of a microscope (such as hair color, length, thickness, and texture); and that he made no exclusion during his review. (2 Hearing Tr. 205-06, 209-12, 214-18, 220-21, 227-28). While the visually dissimilar hairs in this case were described as being blond to reddish blond, Bundy testified that it is "actually quite common" for persons with dark hair (like Twila, Elwin, Randy, and Appellant) to have blond to reddish-blond hair because there is "so much variation with a human head" in terms of observable hair characteristics. (2 Hearing Tr. 212-14, 217). As a result, even though Bundy described four hairs as being "visually dissimilar" to the victims and Appellant, he specifically did not exclude them from being the possible source of the hairs. (2 Hearing Tr. 220-21).[21] Appellant's assertion that the visually dissimilar hairs more likely come from other maternal relatives, like Donnell, is mere speculation.

_____

[21] Appellant's hair is not blond to reddish blond; a videotape was made of Appellant during his book-in at jail on the morning of the murders and it shows his having shoulder length, dark-colored, wavy hair. (SX-31A). Regardless, Bode Lab identified Appellant's mtDNA profile on the same visually dissimilar blond to reddish blond hair. (SX-10 & DX-16, pg. 3[E03 hair]). This further substantiates Bundy's opinion that neither Appellant nor the victims could be excluded as contributors of the visually dissimilar hairs.

The remaining evidence identified by Appellant—the actual mtDNA results—do not help his case. "A favorable DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity if the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Gutierrez*, 337 S.W.3d at 892. The results of mtDNA testing in this case is just the type of testing that would muddy the waters. While Appellant is correct that partial mtDNA profiles obtained on 3 hairs would include Robert Donnell as a potential source, those same results cannot exclude Twila as the possible contributor, nor Twila's biological children (Elwin Caler, Randy Busby, and Lisa Busby), Twila's mother (Beverly Ann Donnell Ward Clark), Twila's siblings (a sister and two brothers), Twila's four maternal uncles (including Robert Donnell), and Twila's maternal grandmother. (SX-23). This is not an exhaustive list, but it illustrates the point that the hairs could have originated from any one or more of Twila's maternal relatives. Instead of exculpatory value, the mtDNA results only serve to broaden the list of potential contributors.

Finally, pictures taken of Twila's body on the livingroom floor at the crime scene show that the carpeted area was filthy. (SX-17 to SX-22). As a result, even if it could be shown that all three hairs did indeed originate from Robert Donnell, there is no evidence that the hairs were actually deposited at the time of the crime or that they were necessarily the product of an unlawful act. Indeed, with over 170 samples

-34-

tested for DNA using STR, Minifiler, and Y-STR analysis, none of the reported results ever identified Donnell much less tied him to the crime.

**B.      The absence of the victims' DNA profiles on Appellant's bloody hand prints and fingerprints does not affirmatively cast doubt on the validity of Appellant's conviction. (Reply to Claim 5(b))**

Appellant acknowledges that DNA testing on blood stains from a back door and from knobs on both doors found profiles consistent with his profile and not a mixture. Appellant's Br. 30 (citing SX-5 & DX-10, pg. 6 [#09-13, #09-14], pg. 7 [#09-17]). He then tries to discount the significance of the forensic results by proposing that the absence of the victims' DNA profiles supports that he is not the real killer. Appellant surmises that the bloody knife on the front porch of the Busby home has a 6-inch blade; that a knife wound penetrated Elwin Caler by as much as 7 inches; that stab wounds to both Elwin and Randy Busby suggest the assailant twisted the knife after making several of the incisions; that the killer must have come into contact with blood from the victims given the length of the knife and the nature of the wounds, but Appellant's DNA profiles on the door and knobs is not mixed with the victims. Appellant's Br. 30-31.

Appellant's supposition does not undermine confidence in the outcome at trial. Forensic evidence at trial established that Appellant left bloody hand prints and bloody fingerprints on the back door and door knobs of the Busby residence. (27 RR

790-91, 796, 911, 913). Post-conviction DNA testing of the blood in the prints identified Appellant's DNA profile. (SX-5 & DX-10, pgs. 6-7). Appellant does not argue that DNA testing results are favorable, but rather, that the absence of DNA from the victims is significant. He cannot seriously undermine the strength of the evidence against him in this manner. From the outset, the DNA results are inculpatory and only serve to strengthen the State's case against Appellant.

The evidence at trial established that a door on the front porch with a large smear of blood was latched shut from the inside. (24 RR 97-99, 103-12). There was a second door at the side of the porch, but no blood stains or other forensic evidence were recovered. The only exit from the Busby house which yielded forensic evidence was the door and knobs exiting the back of the house. If Appellant's argument is to be believed—that the real killer must have blood from the victims on his hands—then it should have appeared on the back door and knobs. If the killer exited the house before Appellant, then the blood stains should have a mixture of the victims' and killer's DNA along with Appellant's DNA profile when Appellant left his bloody prints as he exited the house. However, if the killer exited the house after Appellant, then the victims' blood would have been on top of the bloody fingerprints already left by Appellant on the door knobs. Appellant's speculation is no substitute for the absence of exculpatory DNA results.

Appellant additionally contends that his DNA profile was not found in any locations along with blood of Elwin Caler or Randy Busby, *except for the murder weapon*, whereas if he were the real killer then one would expect castoff or "washed off" blood that is mixed with the victims' blood in many places. Appellant's Br. 32. Although he tries to downplay the significance of his DNA appearing in 8 locations on the bloody knife in profiles revealing a mixture of DNA with one or both stabbing victims, the forensic evidence regarding the knife is anything but favorable. (*See* Part 2 of Post-conviction DNA testing results, *supra*). Appellant's supposition regarding the purported absence of castoff blood is not evidence affirmatively casting doubt on the validity of his conviction.

Regardless, even if the Court viewed Appellant's contention as exculpatory in nature, his allegations cannot be considered "in a vacuum" and "must be viewed in the context of other relevant evidence." *Johnson v. State*, 183 S.W.3d at 520. Appellant emphasizes that his DNA profile was not mixed with DNA of the victims in one or more locations, but ignores that he was wearing heavily blood-stained clothing at the time of arrest. The State tested the clothing and found 278 separate blood stains, several of which were tested and revealed the DNA profiles of Twila and Elwin. (DX-32, pg. 54). Furthermore, the evidence of Appellant's guilt in this case is particularly compelling, as set forth in Part I of the Statement of the Case.

**C.** **The absence of Appellant's DNA profile on testing of the blanket covering Randy Busby's body is not favorable evidence under article 64.04. (Reply to Claim 5(c))**

The evidence at trial established that Randy Busby's body was found laying face down on the top bunk bed, covered by a blanket spotted with blood. (34 RR at STX-33, -34). Post-conviction DNA testing of three blood stains on the blanket identified only Randy's DNA profile and not Appellant's. (SX-5 & DX-10, pg. 8 [#09-25-AA]). Appellant contends that since his own DNA was not found in blood on the blanket and since he had a bleeding wound to his hand (the origins of which have never really been explained), testing results are favorable because they suggest he is not the murderer. Appellant's Br. 34-36. He also argues that the absence of his DNA on the blanket goes against the prosecutor's closing argument which theorized that Appellant cut his hand while in the process of stabbing Randy in the back. Appellant's Br. 34-35.

In certain circumstances, excluding a defendant as a contributor to DNA evidence can be considered exculpatory. *See Smith v. State*, 165 S.W.3d at 364 (holding excluding defendant as contributor of seminal fluid found on female victim after sexual assault could be exculpatory). This is not one of those circumstances. While Apellant's DNA profile did not appear in the 3 tested blood stains, the omission is not favorable. The evidence does nothing to cast doubt on Appellant as

the murderer in light of the ample evidence of his guilt. (*See* Statement of Facts, Part I, *supra*). Neither is the evidence favorable when Appellant's DNA profile was identified in at least 8 locations in the boys' bedroom including on a cassette tape (2 profiles), a tennis shoe (2 profiles), on a cassette tape, on a dresser, on a wall near a dresser, and on a comforter. (*See* Statement of Facts, Part II.B.2., *supra*).

Furthermore, DNA testing results are not exculpatory where, as here, Appellant appears to offer the evidence (or lack there of) to rebut a part of the prosecution's case. During debate over the DNA statute, the Senate rejected a House Floor Substitution to article 64.03(a)(2)(A) that would have read "had exculpatory results been obtained through DNA testing before or at trial, the convicted person could have used those doubts to raise a reasonable doubt as to the person's guilt *or to rebut a part of the prosecution's case*." *Kutzner v. State*, 75 S.W.3d 427, 438 n.23 (Tex. Crim. App. 2002) (citing House Debate on SB 3, 77th Leg., R.S., (www.house.state.tx.us. House Archived Chamber Broadcasts at 1:08-00-2:37:00, March 21, 2001), at 2:14:00) (emphasis added). Because favorable DNA testing results must affirmatively cast doubt on the validity of a conviction and Appellant fails to make this showing, he presents no basis for the Court to reject the trial court's finding under article 64.04.

**D.** **The presence of extraneous alleles on a dishtowel is not evidence that raises a reasonable probability of Appellant being acquitted had the results been available at trial. (Reply to Claim 5(d))**

Finally, Appellant argues that DNA testing on a dishtowel found inside a plastic trash bag could bolster the theory of an alternative suspect. Appellant's Br. 38-39. He overstates the purported significance of extraneous alleles because the results do not help him in satisfying his burden under article 64.04.

DPS forensic examiner Brent Hester analyzed the dishtowel using a minitape procedure where 10 samples were obtained from each side of the towel and then analyzed collectively. (3 Hearing Tr. 124-26). STR testing of Side 1 of the dishtowel revealed a mixture of DNA profiles from Larry Porton (the court reporter at trial) and an unknown contributor. (SX-5 & DX-10, pg. 5 [#09-09 Side 1]). Testing of Side 2 revealed a mixture of DNA profiles from Larry Porton, DPS Trace Analyst John Lan Bundy, and an unknown contributor. (*Id*., pgs. 5-6 [#09-09 Side 2]). Finally, a blood spot (identified as Stain 3) was analyzed using STR testing and a partial DNA profile was identified that was consistent with Twila Busby. (*Id*., pg. 6 [#09-09 Stain 3]).

Appellant argues that these results are favorable because he and all 3 victims were excluded as contributors to the DNA on Sides 1 and 2 of the dishtowel. Appellant's Br. 37. He then proposes that if the evidence had been available at trial, the defense could have argued that possibly the murderer used the dishtowel to wipe

Twila's blood from his hands after killing her and then put the towel in the plastic bag found near the couch. Appellant's Br. 39. The convicting court found this evidence was not favorable. (Record 169-71 [¶¶60-63]).

DNA testing results obtained from the minitape procedure is evidence that has merely "mudd[ied] the waters." *Gutierrez*, 337 S.W.3d at 892. Minitape is an especially sensitive procedure that is very good at doing its job, but that sometimes pulls off too much DNA and leaves a "very nasty mixture" of profiles. (3 Hearing Tr. 124-25). As DPS forensic examiner Hester explained, the additional alleles on the dishtowel could have come from any number of people ever having contact with the dishtowel. (*Id.*). Furthermore, the dishtowel, at best, only has a tenuous connection to the murder. In fact, the only connection is that the towel was found inside a plastic bag that was next to the couch where Twila's body was found.

Although Appellant was excluded as a contributor to the overall DNA profile on both sides of the dishtowel, that evidence is not exculpatory.[22] As this Court reasoned in *Smith v. State*, excluding a defendant as a contributor to a DNA profile on a weapon was not exculpatory when the DNA could have been left on the weapon before the date of the offense. 165 S.W.3d at 364. In this case, Appellant presented

---

[22] The convicting court credited testimony from Brent Hester that while Appellant was excluded on the profile, that still does not rule him as a possible contributor to an allele at a given locus. (3 Hearing Tr. 120-22).

no evidence during the DNA hearing to show that any allele was deposited at the time of the crime, which was necessarily fatal to his showing under article 64.04. To this Court, Appellant takes issue with the convicting court making it his burden to make this showing. Appellant's Br. 39-40. However, *it is* Appellant's burden to demonstrate a reasonable probability that it is more probable than not that he would not have been convicted had DNA test results been available. This he failed to do.

**E.    The cumulative effect of the above-described evidence is insubstantial. (Reply to Claim 6)**

Appellant asserts that when the four areas of post-conviction DNA testing results identified by him above are considered cumulatively, they powerfully bolster the case for reasonable doubt. Appellant's Br. 41. However, for the reasons explained above, Appellant's evidence is not favorable under any standard. He cannot establish a sufficient showing under article 64.04 by cumulating evidence that is not favorable. *See Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) ("A string of harmless errors does not automatically create reversible, cumulative error.").

Finally, Appellant complains the convicting court placed "outsized emphasis" on that fact that his DNA or blood was found on various surfaces throughout the house. Appellant's Br. 41. By his argument, Appellant appears to suggest that his selective DNA results should be viewed in isolation. To the contrary, the convicting

court was required to assess—and did assess—whether, in light of the entire record, the new DNA results raise a reasonable probability of acquittal. Appellant's arguments do not establish error, nor do they cast doubt on the sufficiency of the evidence supporting the convicting court's ultimate finding under article 64.04.

## PRAYER

The Court should affirm the judgment of the trial court that DNA testing results are not favorable to Appellant under article 64.04.

Respectfully submitted:

/s/ Katherine D. Hayes*
KATHERINE D. HAYES
Assistant Attorney General
*Lead counsel          Criminal Appeals Division
SBOT 00796729

Office of the Texas Attorney General
Criminal Appeals Division
P. O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400; (512) 320-8132 fax
katherine.hayes@texasattorneygeneral.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2015, a true and correct copy of the

foregoing document was served via the Court's ECF system to all counsel of record:

Counsel for Appellant
     Robert C. Owen
     Bluhm Legal Clinic
     Northwestern Univ. School of Law
     375 East Chicago Ave.
     Chicago, IL 60611-3069
     robownelaw@gmail.com

     Douglas G. Robinson
     1440 New York Ave., N.W.
     Washington, DC 20005
     robinsondg@msn.com

Counsel for the State
     Franklin McDonough
     District Attorney
     31st Judicial District
     P.O. Box 1592
     Pampa, TX 79066-1592
     Franklin.McDonough@graycch.com

     Edward L. Marshall
     Chief, Criminal Appeals Division
     Office of the Texas Attorney General
     P. O. Box 12548, Capitol Station
     Austin, TX 78711-2548
     edward.marshall@texasattorneygeneral.gov

               /s/Katherine D. Hayes
               Assistant Attorney General
               Criminal Appeals Division

**CERTIFICATE OF COMPLIANCE**

I certify that this State's Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared using Corel WordPerfect Office 12, Times New Roman font with 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i)(2)(A) because it contains 10,756 words, excluding all any parts exempted by Tex. R. App. P. 9.4(i)(1).

 /s/ Katherine D. Hayes
Assistant Attorney General
Criminal Appeals Division